**IN THE UNITED STATES DISTRICT COURT FOR THE**
**WESTERN DISTRICT OF MISSOURI**
**SOUTHWESTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Criminal Action |
| | ) | No. 07-05015-01/02-CR-SW-DGK |
| BRIAN  KEITH  ELLEFSEN | ) | |
| and | ) | |
| MARK  EDWARD  ELLEFSEN, | ) | |
| | ) | |
| Defendants. | ) | |

## GOVERNMENT'S SENTENCING BRIEF

The United States of America, by Beth Phillips, United States Attorney for the Western District of Missouri, Assistant United States Attorney Steven M. Mohlhenrich, and Trial Attorney Michael C. Boteler, respectfully submits this Sentencing Brief in the above-captioned matter.

## I.  INTRODUCTION

For more than six years, Defendants Brian Keith Ellefsen and Mark Edward Ellefsen cheated the United States Treasury and avoided paying taxes on more than $1.5 million of Brian Ellefsen's income from his medical practice, Southwest Missouri Bone & Joint, Inc.  They did so by means of the Aegis Trust System, a scheme to divert income from the practice through a series of sham paper transactions having no economic substance, and disguised the diversion by recording the payments as "management fees," on the corporation's books and records and income tax returns.

Brian Ellefsen accessed the diverted funds first through a credit card drawn on the foreign accounts into which the funds were secreted, and later by way of checks Mark Ellefsen wrote on the account of a Limited Liability Company (LLC) established for that purpose. No reasonable person could have believed this was lawful, certainly not a professional such as Dr. Brian Ellefsen, or a former police officer with a degree in business administration like Mark Ellefsen. And, as the jury found, Defendants did not believe the Aegis scheme was lawful at the time they became and remained involved in it.

The evidence demonstrated that Defendants evaded more than $1.2 million in taxes on Brian Ellefsen's income, despite unequivocal and increasingly emphatic warnings from Brian Ellefsen's long-time accountant, the efforts of Brian Ellefsen's personal attorney to get him to seek unbiased advice, the warnings of others, and the well-publicized criminal investigation of the Aegis Company itself. They did so not because they needed the money, but rather out of greed, arrogance, and the belief that they could get away with it.

For these reasons, and the reasons set forth herein, the Government recommends a sentence of incarceration within the advisory Guidelines range of 51 to 63 months, and an order for restitution in the amount of $1,242,903.55.

## II.  BACKGROUND

Following the jury's May 15, 2009, conviction of both Defendants on all counts of the Indictment, the Court ordered that the United States Probation Office (USPO) complete a Pre-Sentence Investigation as to each Defendant. (Doc. 191.)

On August 11, 2009, the Probation Officer issued a draft Pre-Sentence Investigation Report (PSR) as to each Defendant, for review and comment. By letter dated September 4, 2009, counsel for Mark Ellefsen informed the Probation Officer of his comments and objections

2

regarding Defendant Mark Ellefsen's PSR. (Attachment 1.) By letter dated September 7, 2009, counsel for Brian Ellefsen informed the Probation Officer of his comments and objections regarding Defendant Brian Ellefsen's PSR. (Attachment 2.) By letters dated August 25, 2009, the Government submitted its comments regarding both PSRs to the Probation Officer. (Attachment 3.)

The USPO filed the final PSR as to Brian Ellefsen on September 18, 2009 (Doc. 239), and as to Mark Ellefsen on September 22, 2009 (Doc. 240). On January 12, 2010, the Court issued orders setting both Defendants' sentencing hearings for April 19, 2010. (Docs. 266, 267.) Subsequently, the hearing dates were continued to May 27, 2010, as to Brian Ellefsen (Doc. 271), and June 2, 2010 as to Mark Ellefsen (Doc. 270).

### III. LEGAL STANDARD

Although the Sentencing Guidelines are no longer mandatory, both the Supreme Court and the Eight Circuit have made clear that sentencing after *United States v. Booker*, 543 U.S. 220 (2005), must begin with a properly calculated advisory Sentencing Guidelines range. *See Gall v. United States*, 128 S. Ct. 586, 596 (2007) ("[T]he Guidelines should be the starting point and the initial benchmark."); *Rita v. United States*, 127 S. Ct. 2456, 2464-65 (2007); *Booker*, 543 U.S. at 245-46; *United States v. Plaza*, 471 F.3d 928, 930 (8th Cir. 2006) ("First, the district court must determine the appropriate sentencing range under the Guidelines."). The Supreme Court indicated that the judicial fact-finding necessary to calculate the advisory Guidelines range does not violate the Sixth Amendment. *Rita*, 127 S.Ct. at 2465-66. Thus, in calculating the advisory Guidelines range, this Court must make factual findings using the preponderance of the evidence standard, just as before *Booker*. *United States v. Garcia-Gonon*, 433 F.3d 587, 593 (8th Cir. 2006); *United States v. Pirani*, 406 F.3d 543, 551 n. 4 (8th Cir. 2005) (*en banc*). Next,

3

the district court must decide if a traditional departure under the Guidelines is appropriate, thus creating an advisory Guidelines sentencing range. *Plaza*, 471 F.3d at 930.

After calculating the advisory Guidelines range, the Court must consider that range, along with all the factors listed in 18 U.S.C. § 3553(a), in arriving at the final sentence. *Kimbrough v. United States*, 128 S. Ct. 558, 564 (2007); *Plaza*, 471 F.3d at 930. "The sentencing judge should set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decision-making authority." *Rita*, 127 S. Ct. at 2468 (2007); *see also Gall*, 128 S. Ct. at 597 (explaining that sentencing court "must adequately explain the chosen sentence to allow for meaningful appellate review and to promote the perception of fair sentencing").

## IV. <u>SENTENCING GUIDELINES</u>

### A. <u>The Offense Conduct</u>

The Government agrees with the Probation Officer's description of the offense conduct, set forth in ¶¶ 10-21 of each Defendant's PSR. Additionally, the Government's 15-page statement of facts in its Consolidated Response to Defendants' post-trial motions contains further detail and citations to the record. (Doc. 230 at 5-20.) For purposes of this Brief, the Government adopts its earlier statement of facts as its description of the offense conduct.

Defendants' objections to the description of the offense conduct are misplaced. Defendant Brian Ellefsen objects to ¶¶ 10-21 of his PSR, and states that "while conceding that he has been convicted of the offenses as set out in the indictment maintains that findings of filing false corporate income tax returns were not required by the jury and are as a matter of fact, incorrect." (Doc. 239, *Addendum* at 1.) Not so. The filing of corporate returns falsely reporting

4

as "management fees" the diversion of Brian Ellefsen's income to the Aegis-created entities was an integral part of Defendants' scheme to defraud the United States.

Both Defendants object to ¶ 18 of their respective PSRs, regarding the source of the funds used to build Brian Ellefsen's home. Defendant Brian Ellefsen states "the extent of any funds used to pay for construction of Brian Ellefsen's $1.3 million home they came from bank loans. It is uncontested that there was a $1.2 million mortgage on the home which involved contemporaneous construction loans." (Doc. 239, *Addendum* at 2; *see also* Doc. 240, *Addendum* at 1.) This is incorrect. The evidence at trial demonstrated the construction loans were not contemporaneous. As the Court no doubt recalls, at trial Defendants repeatedly attempted to blur the issue of when the funds were drawn on the construction loans, in order to argue that the funds for the home did not come from the Aegis entities, and that there was consequently no tax loss in 2001. However, the first draw on the line of credit took place on November 1, 2001, in the amount of $50,000. (Gov. Ex. 52.) Prior to that draw, Defendants paid more than $550,000 for the construction of Brian Ellefsen's home, directly from the "management fees" that had been diverted to the Aegis system. (*See* Transcript of Testimony of Sharon Vandenberg from Day 6 of the Jury Trial on May 11, 2009, at page 114 l, line 11.)

Defendant Mark Ellefsen objects to ¶ 16 of his PSR, and denies stating to accountant Lynn Bell-Osina (Bell-Hampp) that they would not amend their returns, and notes that Aegis reassigned the Ellefsens' account from Quay. (Doc. 240, *Addendum* at 1.) This is both incorrect and misleading. Bell-Osina's uncontradicted testimony was that Mark Ellefsen did tell her he and Brian would not amend. And in fact they did not, until more than five years later when they

5

learned they were targets of the grand jury investigation.[1]  Further, Bell-Osina's advice to Mark

Ellefsen that Aegis was illegal came well after Quay was already out of the picture.  Quay left

the Aegis Company in November or December of 1997, only three months or so after Brian

Ellefsen established his Aegis trusts, and thereafter had no contact with either Brian or Mark

Ellefsen.  (*See* Transcript of the Testimony of James S. Quay from Jury Trial Before Greg Kays

United States District Judge at 54-56.)  Defendants began using promoter William Cover no later

than the summer of 1999.  (Gov. Ex. 173.)  Bell-Osina prepared and filed Brian Ellefsen's 1998

Aegis trust returns in October 1999.  (Gov. Ex. 101, 113.)  And Bell-Osina told Mark Ellefsen

Aegis was illegal and advised him to amend all the returns on approximately April 15, 2000,

more than two years after Defendants' last contact with Quay.  (*See* Transcript of Attorney and

Court Conferences and Testimony of Lynn Bell-Osina from Day 3 of the Jury Trial on May 6,

2009, hereinafter "Bell-Osina Tr.," at 80-81.)

Defendant Mark Ellefsen objects to ¶ 19 of his PSR, and states "no evidence exists that

defendant prepared his brother's returns.  Defendant did provide quick books to his brother's

accountants which accurately reflected all the deposits and checks written with regards [sic] to

his brother's business."  (Doc. 240, *Addendum* at 1.)  Defendant Mark Ellefsen misses the point.

Mark Ellefsen was not charged with preparing Brian Ellefsen's returns.  The jury convicted him

of Counts Five, Six, and Seven of the Indictment, which charged him with aiding or assisting in

the preparation of his brother's false U.S. Individual Income Tax Returns, Forms 1040, for the

tax years 2000, 2001, and 2002, in violation of 26 U.S.C. § 7206(2).  Mark Ellefsen's aid and

assistance took the form of managing the medical practice and many of the Aegis-created

---

[1] Even then, Defendants did not amend the corporate returns to collapse the trusts, as Bell-Osina advised.

entities for Brian Ellefsen (and attending an Aegis seminar for that purpose), transferring funds between the entities, using some of those funds for the construction of Brian Ellefsen's residence and for other personal expenses of Brian Ellefsen, and then, knowing that all this had been done to unlawfully avoid paying taxes, providing information to an accountant that caused that accountant to prepare the false returns.

## B.   Guidelines Calculations

As to both Defendants, the United States concurs with the Probation Officer's computation of the offense level (¶¶ 26-37 of each PSR), criminal history (¶¶ 38-40 of each PSR) and Guidelines range (Doc. 239 at 16 ¶ 67 as to Brian Ellefsen, and Doc. 240 at 16 ¶ 63 as to Mark Ellefsen).  Defendants raise several objections to the calculated Guidelines, including objections to the tax loss, sophisticated means enhancement, and acceptance of responsibility reduction.

### 1.   *Criminal Tax Loss Computation*

The major component of the Guidelines calculations in the instant case is the tax harm, which is the total amount of loss that was the object of the offense.  U.S.S.G. § 2T1.1(c)(1).  The tax loss is not reduced by any payment of the tax subsequent to the commission of the offense. U.S.S.G. § 2T1.1(c)(5).  The tax loss for Sentencing Guidelines calculations does not include penalties and statutory interest.  U.S.S.G. § 2T1.1, *Application Note 1*.  In a tax case, relevant conduct for sentencing purposes encompasses all known tax loss for all years.

The tax loss established at trial included the under-reported individual income tax liability of defendant Brian Ellefsen, and the under-reported corporate income tax for Southwest Missouri Bone & Joint, Inc.  Further, both Brian Ellefsen and Southwest Missouri Bone & Joint, Inc. had additional taxes due to the State of Missouri, based upon the under-reported

7

Federal individual and corporate income taxes, which amounts constitute relevant conduct for sentencing purposes.

The PSR correctly reports the tax loss using the following table setting forth the criminal computations presented by Revenue Agent Sharon Vandenberg at trial, plus the Missouri tax computations automatically resulting from the adjustments to the Federal tax liability:[2]

| Tax Year | Additional Individual Income Tax Liability | | Additional Corporate Income Tax Liability | | Total Tax Harm |
|---|---|---|---|---|---|
| | Federal | Missouri | Federal | Missouri | |
| 1997 | $ 29,487 | $ 4,934 | $ 37,085 | $ 5,436 | $ 76,943 |
| 1998 | 74,128 | 12,155 | 52,581 | 7,766 | 146,630 |
| 1999 | 21,484 | 4,284 | 31,439 | 4,593 | 61,800 |
| 2000 | 263,148 | 40,814 | 268,727 | 39,589 | 612,278 |
| 2001 | 158,410 | 24,624 | 132,872 | 19,575 | 335,480 |
| 2002 | 16,848 | 2,844 | 22,502 | 3,323 | 45,517 |
| Totals | $ 563,505 | $ 89,655 | $ 545,206 | $ 80,282 | **$ 1,278,648** |

Defendants contest these computations, and submit that the tax loss should be $546,657. Defendants appear to have three points of contention. The first is the Government's disallowance of the false deduction for "management fees" on the corporate returns. Defendants argue they are entitled to re-categorize this item as wages to Brian Ellefsen despite the fact that they never amended the corporate returns.[3] As this Court has ruled, the law is clear that such disallowed deductions should be treated as constructive dividends. (Doc. 265 at 12-13.)

_____

[2] Revenue Agent Vandenberg's computations as to the criminal tax loss are in Attachment 4 to this Brief.

[3] The Government has fully briefed this issue in its opposition to Defendants' post-trial motions. (*See* Doc. 230 at 33-36; Doc. 250 at 10-13.)

8

Second, Defendants object to the inclusion of the state tax loss amounts in the total for the purpose of calculating Defendants' offense level. While the Eighth Circuit has not addressed this particular issue as of yet, every Circuit which has done so has concluded state tax losses that "were part of the same course of conduct or common scheme or plan as the offense of conviction" are properly included as relevant conduct.[4] In this case, the filing of the false federal tax returns, which improperly claimed the management fees as deductions on the corporate returns and failed to report the management fees as income on the personal returns, mirrored the same defects with the false state corporate and personal tax returns. The federal and state tax returns were filed during the same time period and on a regular basis which further shows that the state tax loss constitutes relevant conduct.

Third, Defendants object to the Government's tax computations because they contend that the IRS agreed with the liability as set forth in Brian Ellefsen's amended returns, filed in 2005 and 2006. (Doc. 239, *Addendum* at 2; Doc. 240, *Addendum* at 1-2.) This contention is incorrect, and is based on Defendants' misrepresentation of the evidence relating to the posting of Brian Ellefsen's amended returns.[5]

---

[4] For an excellent, and timely, discussion of this issue, *see United States v. Yip*, 592 F.3d 1035 (9th Cir. 2010); *see also United States v. Powell*, 124 F.3d 655, 656 (5th Cir.1997) (upholding the inclusion of state tax losses as "relevant conduct" when computing tax loss arising from federal motor fuel excise tax scheme); *United States v. Maken*, 510 F.3d 654, 657-59 (6th Cir. 2007) (finding the losses caused by defendant's failure to pay state income and sales taxes constituted relevant conduct); *United States v. Baucom*, 486 F.3d 822, 829 (4th Cir. 2007) (holding that failure to file state tax returns was part of the same course of conduct for which defendants were convicted), vacated on other grounds, 128 S. Ct. 870 (2008) ; *United States v. Fitzgerald*, 232 F.3d 315, 320-21 (2d Cir. 2000) (affirming inclusion of state and city tax evasion in total tax loss calculation); *United States v. Schilling*, 142 F.3d 388, 390 (7th Cir. 1998) (state excise tax loss included in tax loss calculation);

[5] The Government has fully briefed this issue in its Sur-Reply in opposition to Defendants' post-trial motions. (*See* Doc. 250 at 3-10.)

9

### 2.    *Sophisticated Means*

The United States agrees with the Probation Officer that Defendants conduct constitutes "sophisticated means" under both U.S.S.G. §§ 2T1.1(b)(2) and 2T1.4(b)(2), and a two-level increase is warranted as to each Defendant.  Defendants conspired together and with the promoters and accountants of the Aegis Company to avoid paying individual income taxes owed by Brian Ellefsen and corporate income taxes owed by the medical practice, Southwest Missouri Bone & Joint, Inc.  They did so by means of financial and monetary transactions shuttling funds through a series of shell entities created with the assistance of the Aegis Company.  The Aegis Trust System involved the establishment of numerous trusts (and later, a limited liability company), the opening of various bank accounts, including offshore bank accounts at Swiss American Bank in St. John's, Antigua, and the use of a secured offshore credit card to access those funds.  This conduct clearly constitutes sophisticated means and falls directly within the example provided by the sentencing commission, "[c]onduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts ordinarily indicates sophisticated means."  U.S.S.G. § 2T1.1 (Application Notes 4).

### 3.    *Acceptance of Responsibility*

Defendant Brian Ellefsen argues that his early voluntary payment of a substantial amount of the back taxes he owed indicates an acceptance of responsibility.  U.S.S.G. § 3E1.1.  Although Defendant Brian Ellefsen paid $533,361.57 in back taxes prior to conviction, this is not the rare case in which payment of restitution warrants a reduction.  Brian Ellefsen did not pay any of the back taxes until after being informed that he was under criminal investigation.  In essence, Defendant Brian Ellefsen attempted to buy his way out of a crime by paying his back taxes.  When that did not work, he put the Government to its burden of proof at trial and made no

10

stipulations eliminating factual elements of guilt or limiting trial to a constitutional or statutory challenge. Rather, at trial, Brian Ellefsen attempted to minimize his role by arguing that he relied upon bad advice of the Aegis trust promoters over the advice of his long-time accountant. He has also vehemently fought the tax loss computations, including arguing that he owed no additional taxes in 2002. The United States agrees with the Probation Officer that under these facts, Defendant Brian Ellefsen, is not entitled to a reduction for an acceptance of responsibility. *United States v. Field*, 110 F.3d 592, 594 (8th Cir. 1997) (upholding a denial of acceptance of responsibility departure where defendant made substantial restitution, but went to trial on some counts, were no stipulations on guilty conduct, and attempted to minimize his role).

### 4. Conclusion

Both U.S.S.G. §§ 2T1.1 and 2T1.4 provide for a base offense level as determined by the tax table at U.S.S.G. § 2T4.1. Both Defendants were members of the conspiracy charged in the Indictment for the entire period charged, so both are liable for the full amount of the tax loss. The criminal tax loss in this case, including relevant conduct, is $1,278,648. According to the table at U.S.S.G. § 2T4.1, the base offense level for a tax loss between $1,000,000 and $2,500,000 is 22. An additional two-point enhancement is warranted for use of sophisticated means. Accordingly, the United States agrees with the Probation Officer that the adjusted offense level for each Defendant should be 24. Both Defendants' advisory sentencing ranges should be 51 to 63 months imprisonment, in Zone D.

## C. Defendants' Proposed Grounds for Departure

The Probation Officer found no grounds for a departure under the Guidelines for either Defendant. (Doc. 239 at 17-18, Doc. 240 at 18.) Both Defendants object, and argue grounds for departure exist. (Doc. 239, *Addendum* at 3-4; Doc. 240, *Addendum* at 3.) For the reasons set

11

forth below, the Probation Officer's analysis is correct. The Government recommends that the Court deny the requested downward departures, on discretionary grounds. *See*, e.g., *United States v. Frokjer*, 415 F.3d 865, 874-75 (8th Cir. 2005).

### 1.   Brian Ellefsen

Defendant Brian Ellefsen's response to the draft PSR lists the following factors he contends warrant a sentence outside the Guidelines range:

> [T]he probation officer failed to consider factors such as impact on the community, deterrence, the lost community service from the only orthopedic surgeon in Carthage, Missouri, the fact that the doctor has already lost his home through foreclosure and faces over $700,000 in deficiency judgements, and the fact that he is a single father of three children 18 or under who also has child support and alimony responsibilities to his former spouse.
>
> There are two significant additional matters which have come to the attention of the probation officer which are not mentioned in her report. One is that even the prosecutor has recommended that the defendant be allowed for himself and the community to return to medical practice as soon as any period of incarceration has been served. The second is that the doctor is suffering from severe clinical depression, partly as a result of these proceedings which would make incarceration strongly contraindicated. His medical doctor/psychiatrist has many years experience mostly on the government side with defendants and prisoners in the Missouri prison system. His report will be submitted prior to sentencing, and he will be a witness for Dr. Ellefsen during the sentencing proceedings.

(Doc. 239, *Addendum* at 3-4.)   Defendant Brian Ellefsen's letter to the Probation Officer seems to list these factors in the context of a *Booker* variance, but this Brief will first consider them as proposed grounds for a downward departure.

### a.   Impact on the community

Defendant Brian Ellefsen requests a downward departure because he is the only orthopedic surgeon in Carthage, Missouri, and any incarceration would have a detrimental impact on the community. A downward departure on this basis is permitted only if Ellefsen's

12

impact on the community is truly exceptional.  *United States v. Groene*, 998 F.2d 604, 607 (8th Cir. 1993); *United States v. O'Malley*, 364 F.3d 974, 983 (8th Cir. 2004).

Even if he is the only orthopedic doctor in Carthage, there are several orthopedic doctors in the surrounding areas.  In Joplin, which is less than 25 miles away, there are 15 specialists. (*See* Attachment 5, Declaration of Dawn Seaton.)  In Springfield, which is approximately 60 miles away, there are more than 40 orthopedic doctors.  (*Id*.)  The extra travel would not present extraordinary hardship for his patients that live in Carthage.  Due to the availability of other doctors within 60 miles, the loss of Defendant Brian Ellefsen would not cause an extraordinary hardship on the community.  *Groene*, 908 F.2d at 608 (reversing a downward departure where a chiropractor was the only one in his community, but several other chiropractors were located within 70 miles).

Moreover, this argument lacks any merit because Defendant Brian Ellefsen has already stopped practicing medicine.  Defendant Brian Ellefsen reported to the Probation Officer that he stopped practicing medicine on June 15, 2009, due to depression.  (Doc. 239 ¶ 59).  He also told the Probation Officer that as of July 31, 2009, that he is in the process of applying for mental health disability benefits for his depression.  (Doc. 239 ¶ 54.)  To argue that he should receive a reduced sentence so he can continue to provide services to a small town, while he already closed his practice, is disingenuous.  Even if Brian Ellefsen wanted to practice, he faces other obstacles that could prevent him from practicing medicine, including losing his ability to receive Medicaid funds[6] and his medical license from the state.

---

[6] The Centers for Medicare & Medicaid Services (CMS) is a branch of the U.S. Department of Health and Human Services.  CMS is the federal agency that administers the Medicare program and monitors the Medicaid programs offered by each state Centers for Medicare & Medicaid Services.  CMS current rules provide for the revocation of enrollment and

13

### b. Financial and Caretaking Consequences

Defendant Brian Ellefsen argues that the financial consequences to his family and the loss of a caregiver to his children justify a downward departure.   A district court may depart from the Guidelines range if a defendant has significant family responsibilities such that incarceration would cause unusual harm.  *United States v. Farrington*, 499 F.3d 854, 862 (8th Cir. 2007) (citing U.S.S.G. § 5H1.6).  "But, it is a disfavored basis for departure, that is not triggered by the kind of family hardships that are ordinarily incident to incarceration." *Id*. (citations omitted).  Defendant Brian Ellefsen has three children, one a 19 year-old college student, one who is 17, and a third who is 9, but lives with his mother.  (Doc. 239 ¶¶ 45, 46.)  As with any defendant with children, incarceration will no doubt have an impact on his children due to the separation and loss of income.  *United States v. Johnson*, 908 F.2d 396, 399 (8th Cir.1990) (noting that "parents frequently are separated from children during periods of incarceration").  However, there has been no evidence established that the loss of caregiving and financial support by Defendant Brain Ellefsen would substantially exceed the harm ordinarily incident to incarceration, thus no departure is warranted.

### c. Mental Health

Defendant Brian Ellefsen argues for a departure based on his current mental health condition, an alleged severe clinical depression.  Although the United States has not received the medical report regarding Brian Ellefsen's condition and thus, lacks information regarding its extent, many Americans suffer from depression.  People with this condition may benefit from both counseling and medication, both of which are available in a prison setting.  Thus, a

---

billing privileges in Medicare program if a provider has been convicted of certain felonies, including tax evasion.  42 CFR 424.535(a)(3)(B).

recommendation that Brian Ellefsen serve his sentence at a facility that can adequately monitor

and/or treat his condition would resolve this concern. *Farrington*, 499 F.3d at 862 ("The court

also accounted for Farrington's health concerns when it recommended to the Bureau of Prisons

that Farrington serve his sentence at a facility that could properly monitor his medical needs

mental and emotional conditions are not ordinarily relevant.").

### d.    *"Even the prosecutor recommended . . ."*

Finally, Defendant Brian Ellefsen notes that Assistant United States Attorney Steven

Mohlhenrich recommended to the state licensing board that the defendant be allowed to return to

medical practice as soon as any period of incarceration has been served. Defendant does not

explain in what way this has any impact on the sentence. The statement contains no

representations as to what the United States requests as an appropriate period of incarceration

and only concerns with what happens after incarceration.

### 2.    *Mark Ellefsen*

Defendant Mark Ellefsen objects to Page 18, Paragraph 75 of the PSR, which states that

there are no factors that may warrant departure.

> The defendant states that this paragraph should state that the factors that may
> warrant departure are:
>    A) Extraordinary restitution
>    B) Aberrant behavior
>    C) Mitigation due to the fraud caused by the accountants
>    D) Extraordinary military service

(Doc. 240, *Addendum* at 3.) Each of these grounds is utterly without merit.

### a.    *Extraordinary Restitution*

Defendant Mark Ellefsen did not pay a dime of restitution. In 2005 and 2006, after being

informed of the grand jury investigation, and in an attempt to avoid indictment, Brian Ellefsen

15

filed amended personal returns which partially acknowledged the fact that he had evaded taxes for the years 1997 through 2002. Defendant Brian Ellefsen attempted to buy his way out of a crime. As is discussed with respect to Brian Ellefsen, this was not the sort of extraordinary restitution that might warrant credit under the Guidelines.

### b. Aberrant Behavior

Defendant Mark Ellefsen's letter to the Probation Officer does not discuss how he merits a departure for "aberrant behavior." As the PSR states, "[t]he aberrant behavior factor is especially without merit since 5K2.20 specifically notes the offense must be a single criminal occurrence that was committed without significant planning and was of limited duration." (Doc. 240, *Addendum* at 3, Probation Officer's Response to Defendant's Objection to page 18, ¶ 75.) As the jury found, Defendants' conspiracy to defraud the United States spanned six years, and involved significant planning and the intentional violation of a known legal duty by both Defendants.

### c. "Fraud Caused by the Accountants"

Defendant Mark Ellefsen should not receive a downward departure based on the fraud caused by the accountants. The Aegis Trust promoters did sell the Ellefsens a tax evasion scheme and the main Aegis Trust promoters have received significant prison sentences. The actions of those promoters do not mitigate Mark Ellefsen's conduct. The jury found and the evidence supported the finding that Defendants willfully, intentionally, and knowingly violated the tax laws of the United States by using the Aegis Trust system. The Ellefsens received several warnings that the Aegis system was illegal from Michael Stelmacki. Lynn Bell-Hamp, an Aegis accountant used by the Ellefsens, specifically told Mark Ellefsen that the Aegis system was illegal and advised him to amend the tax returns. Nonetheless, Defendants made the

16

decision to use, and continue to use, the Aegis trust system to hide over a million dollars from the IRS.

### d.    *"Extraordinary Military Service"*

A downward departure based on military service is warranted in only extraordinary cases. U.S.S.G. § 5H1.11; *United States v. Morken*, 133 F.3d 628, 629 (8th Cir. 1998). As the Probation Officer found, there is no extraordinary military service in this case.

## V.    RESTITUTION

Both Defendants stand convicted of Count One, charging violation of 18 U.S.C. § 371 and covering the tax years 1997 through 2002. Pursuant to 18 U.S.C. § 3663A, restitution is mandatory for all counts of conviction involving Title 18 offenses, but does not include relevant conduct.[7] The requested restitution includes statutory interest on unpaid amounts as of the date of sentencing. *See United States v. Johannsen*, 36 F.Supp.2d 1135 (S.D. Iowa 1999) (finding that under the MVRA interest is required to be part of the restitution order); *United States v. Gordon*, 393 F.3d 1044, 1058-59 (9th Cir. 2004) (prejudgment interest is necessary to make the victim whole). The restitution requested does not encompass Defendant Brian Ellefsen's entire civil tax liability, such as penalties.[8] As set forth in the chart below, restitution is due to the United States Treasury, in the amount of $1,242,903.55. The Revenue Agent's supporting computations are in Attachment 6 to this Brief, and the Government's proposed Restitution Order is Attachment 7.

---

[7] Because the state tax loss is not part of the count of conviction and is only relevant conduct, the state tax loss is not included in the proposed restitution order.

[8] There has been no civil examination of Brian Ellefsen's personal or corporate income tax returns, which examination may also involve the propriety of certain deductions claimed, and the assessment of fraud penalties.

| Tax Year | Individual Income Tax Due, Payments Made, and Interest | | | Corporate Income Tax Due (no payments made) | |
|---|---|---|---|---|---|
| | Add'l Tax | Paym'ts | Interest | Add'l Tax | Interest |
| 1997 | $  29,487.00 | $          0.00 | $ 35,205.00 | $  37,085.00 | $  44,852.17 |
| 1998 | 74,128.00 | (50,642.00) | 62,162.57 | 52,581.00 | 54,797.01 |
| 1999 | 21,484.00 | (50,665.00) | 3,833.14 | 31,439.00 | 27,787.63 |
| 2000 | 263,148.00 | (261,309.00) | 109,997.12 | 268,727.00 | 194,811.64 |
| 2001 | 158,410.00 | (179,814.57) | 42,648.37 | 132,872.00 | 80,534.15 |
| 2002 | 16,848.00 | 0.00 | 8,590.66 | 22,502.00 | 11,403.49 |
| Totals | $ 563,505.00 | $(542,430.57) | $ 262,437.03 | $ 545,206.00 | $ 414,186.09 |
| **TOTAL RESTITUTION DUE:  $1,242,903.55** | | | | | |

## VI.   STATUTORY SENTENCING FACTORS

Considering the large tax loss, the scope of Defendants' actions, and the importance of deterrence in tax crimes, the United States requests the Court to impose a sentence within the advisory guideline range of 51 to 63 months and requests a sentence within the middle of the range.  Such a sentence is reasonable and consistent with the sentencing factors identified in 18 U.S.C. § 3553(a).[9]

_____

[9] The § 3553(a) factors include:
(1) the nature and circumstances of the offense and the history and characteristics of the defendant;
(2) the need for the sentence imposed-
    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
    (B) to afford adequate deterrence to criminal conduct;
    (C) to protect the public from further crimes of the defendant; and
    (D) to provide the defendant with needed ... medical care, or other correctional treatment in the most effective manner;
(3) the kinds of sentences available;
(4) the kinds of sentence and the sentencing range established for-

Defendants' crimes are serious and fall squarely within the class of cases to which the applicable Guidelines provisions are addressed. As has been presented in great detail in various motions and at trial, Defendants, for more than six years, conspired together to avoid paying taxes on more than $1.5 million of Brian Ellefsen's income from his medical practice through the use of the Aegis Trust System. They diverted income from the practice through a series of sham paper transactions having no economic substance and sent the money through various entities including offshore accounts. All the while, they disguised the diversions as legitimate business expenses.

The Government's recommendation of a within-Guidelines sentence is based in part on the fact that such a sentence properly reflects the accumulated wisdom and expertise of the Sentencing Commission and serves the vital goal of uniformity and fairness in sentencing. While the Guidelines now serve as one factor among several, the Sentencing Commission continues to "fill[] an important institutional role: It has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise,'" *Kimbrough v. United States*, 128 S. Ct. 558, 574 (2007) (quoting *United States v. Pruitt*, 502 F.3d 1154, 1171 (10th Cir. 2007) (McConnell, J., concurring)). The Supreme Court has acknowledged that, "in the ordinary case, the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Kimbrough*, 128 S. Ct. at 574 (quoting *Rita v. United*

---

        (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines ...;
(5) any pertinent policy statement ...;
(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct....

*States*, 127 S. Ct. 2456, 2465 (2007)). Further, the advisory Guidelines are the sole means available for assuring some measure of uniformity in sentencing, fulfilling a key Congressional goal in adopting the Sentencing Reform Act of 1984. In sum, all of the § 3553(a) considerations favor the imposition in this case of a within-Guidelines sentence.

In contrast with most other nations, the United States' tax system depends to an extraordinary degree on voluntary compliance with the law. Taxpayers are expected to truthfully report their income to the IRS, and pay their fair share. To that end, the Sentencing Commission has recognized the importance of deterrence in criminal tax cases:

> *The criminal tax laws are designed to protect the public interest in preserving the integrity of the nation's tax system. Criminal tax prosecutions serve to punish the violator and promote respect for the tax laws. Because of the limited number of criminal tax prosecutions relative to the estimated incidence of such violations, deterring others from violating the tax laws is a primary consideration underlying these guidelines. Recognition that the sentence for a criminal tax case will be commensurate with the gravity of the offense should act as a deterrent to would-be violators.*

U.S.S.G. § 2T1.1, Introductory Commentary. A guideline prison sentence would send a powerful message to individuals who hide their money offshore and who use abusive trusts to evade paying their fair share of taxes will not be tolerated. The issue of the improper use of offshore bank accounts is a serious and large issue, as is evident by the recent UBS settlement and related cases. As the Eighth Circuit recognized, "[T]he goal of deterrence [in a tax prosecution] rings hollow if a prison sentence is not imposed." *United States v. Ture*, 450 F.3d 352, 358 (8th Cir. 2006).

Defendants argue that the reasons calling for downward departures, if rejected, should be considered for variances under *Booker*. Variances do differ from departures. *United States v. Myers*, 503 F.3d 676, 684 (8th Cir.2007) ("Guidelines departures and post-*Booker* variances are

20

different. There may well be cases that would not justify a departure under the Guidelines but which are appropriate for a variance.") (internal citation and quotations omitted). Factors ordinarily considered irrelevant in calculating the advisory guideline range, or in determining whether a guideline departure is warranted, can be relevant in deciding whether to grant a variance. *Cf. United States v. White*, 506 F.3d 635, 644 (8th Cir.2007) (rejecting the government's argument that a sentence was unreasonable because a variance was based "in part of some factors ordinarily considered irrelevant in calculating the advisory guideline range[.]").

In addition to the arguments the Government made with respect to the sentencing guidelines, Defendants created the situations and issues that they now wish to use as excuses. If Brian Ellefsen is so important to his community and to his family, then why did he risk hurting so many people by participating in this criminal conduct for several years? Michael Stelmacki warned Brian and Mark Ellefsen time after time about getting involved in abusive trusts. In 1997, Stelmacki prophetically warned that "I am asking that you consider the worst case scenario in which the I.R.S. takes the position that you are committing tax evasion. They have the power to assess huge penalties and interest, to prosecute you, to ruin your career, and seize your property. Is the risk worth it?" Brian and Mark Ellefsen knew Aegis was unlawful, and made the choice to roll the dice and take the risk. Brian and Mark Ellefsen risked their careers, their reputations, and their families over money.

In sum, the Government respectfully submits that in the instant case, full consideration of the § 3553(a) factors confirms the wisdom of the Sentencing Commission, and supports the imposition in this case of a within-Guidelines sentence.

21

# VII.  CONCLUSION

For the reasons set forth above, full consideration of the 18 U.S.C. § 3553(a) factors supports the imposition of the Guidelines-recommended punishment as to both Defendants. Accordingly, the United States respectfully recommends that each Defendant be sentenced to between 51 and 63 months imprisonment, to be followed by a term of supervised release. Further, for the reasons set forth above, the United States recommends that the Court order Defendants to pay restitution to the United States Treasury, as a joint and several obligation, in the amount of $1,242,903.55.  Finally, considering the amount of restitution due and the expectation that civil examination of Brian Ellefsen's taxes will result in further tax liability, the Government does not request that Defendants be ordered to pay a fine or the costs of prosecution.

Respectfully submitted,

BETH PHILLIPS
United States Attorney

By:   */s/ Steven M. Mohlhenrich*
STEVEN M. MOHLHENRICH
Assistant United States Attorney


*/s/  Michael C. Boteler*
MICHAEL C. BOTELER
Trial Attorney, Tax Division
United States Department of Justice

22

**CERTIFICATE OF SERVICE FOR CM-ECF PARTICIPANTS:**

      The undersigned hereby certifies that a copy of the foregoing was delivered on May 12, 2010, to the CM-ECF system of the United States District Court for the Western District of Missouri for electronic delivery to all counsel of record.

*/s/ Steven M. Mohlhenrich*

**STEVEN M. MOHLHENRICH**
Assistant United States Attorney